UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HUNT CONSTRUCTION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:04-cv-1720-JDT-TAB |
| | ) | |
| | ) | |
| ALLIANZ GLOBAL RISKS U.S. | ) | |
| INSURANCE COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 56)**[1]

Wayne County, Michigan, received so much rain during the summer of 2000 that it was declared a federal disaster area. Unfortunately, Plaintiff Hunt Construction Group ("Hunt") was building an airport terminal for Northwest Airlines ("Northwest") in Wayne County at this time. According to Hunt, the rain physically damaged construction and repairing this damage delayed the project schedule. Hunt had a builder's risk policy with Defendant Allianz Global Risk U.S. Insurance Company ("Allianz"), and made a claim under this policy for the direct damage to the construction, as well as for expediting costs, temporary heating costs, and indemnification of the liquidated damages Northwest imposed against Hunt for late completion. Allianz made payment on some of the direct damages claims but denied the rest. Hunt brings this case in federal court for enforcement of the policy under diversity jurisdiction. On this motion for

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

summary judgment, Allianz presents several theories as to why it deserves summary judgment on all or some of Hunt's contractual claims.

I.  **BACKGROUND**[2]

In the spring of 1999, Northwest contracted with Hunt to be the General Contractor on the construction of a new Northwest Airlines Midfield Terminal at the Detroit Metropolitan Wayne County Airport.  (Decker Aff. ¶ 3.)  By all accounts, this was an extremely complicated and expensive project.  (*Id.* ¶¶ 4-5.)  Construction began March 1999 (*id.* ¶ 9), with work to be completed by October 31, 2001 (Def.'s Ex. 1 at 00815-6).  Hunt faced $25,000 liquidated damages for each day construction lasted beyond October 31.  (Def.'s Ex. 1 at 01000-2, -3.)

Prior to the commencement of construction, Hunt purchased a builder's risk policy (the "Policy") from Allianz insuring "against all risks of physical loss or damage to" the project.  (Def.'s Ex. 2 at AGR 0029.)  The Policy required Hunt "in the event of loss or damage" to "give immediate advice thereof to the Insurers" (*id.* at AGR 0036) and requires "a detailed proof of loss" from Hunt "as soon as practicable" (*id.* at AGR 0037). The manner of giving notices is specified under the policy; they are to be given by Hunt to Allianz through Drayton Insurance Brokers.  (*Id.* at AGR 0039.)

---

[2] This background presents the facts in a light most favorable to Plaintiff as the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Over time, Hunt and Allianz agreed to several coverage extensions to the Policy. The first endorsement extended coverage to include expediting costs; i.e., "for overtime night work [and] work on public holidays . . . to facilitate the repair . . . of the Property Insured which [has] been lost, damaged or destroyed[,] and which [is] necessary to return the work . . . to the same schedule actually being observed prior to" the loss or damage. (*Id.* at AGR 0026.) Another extension provided coverage for liquidated damages imposed on Hunt by Northwest because of a delay in the completion of the project "due to direct physical loss or direct physical damage." (*Id.* at AGR 0021.) This extension required Hunt to "immediately notify" Allianz of any revisions to the project schedule which might delay completion as a result of a covered loss. (*Id.* at AGR 0023.)

About a year into the construction, the project underwent a severe setback—the rains leading to this suit. On April 20, 2000, the project site was inundated with heavy rain. (Decker Aff. ¶ 10.) The heavy rain continued through the summer and there was so much rain that the county was declared a federal disaster area.[3] (*Id.*) All of the water did a great deal of damage to the project, destroying tunnels that contained piping and electrical wiring for the terminal. (Prewitt Dep. 148; Decker Aff. ¶ 11.) All of this destroyed work had to be replaced.

---

[3] According to Allianz, there were six rain events: (1) April 20, 2000; (2) May 9, 2000; (3) May 18, 2000; (4) June 24, 2000; (5) July 29-30, 2000; and (6) September 10-11, 2000. (Kennedy Aff. ¶ 6.)

Unfortunately, much of this cleanup and repair was on "critical path" activities, meaning that delay in these activities might delay the entire project. (Decker Aff. ¶ 11-12; Pl.'s Ex. H 8.) Hunt claims that it took steps to catch up, but at a significant cost to itself. (Decker Aff. ¶ 12.) Hunt also had to figure out a way to provide heating to the project because the water destroyed the piping that was supposed to provide hot water during the winter. In order to complete its repairs, Hunt needed heat. (*Id.* ¶ 17.) Hunt has estimated its temporary heating costs at over $2 million. (*Id.*)

Both sides agree that Allianz received notice of the damage from the rain at least by March 16, 2001, when it provided notice to Drayton in the manner specified in the Policy. (Def.'s Ex. 15.) This was roughly six months after the last rain event the project suffered and eleven months after the first. Hunt provides no explanation for this delay in giving notice. However, Hunt claims that Len Wentworth, an adjuster for an outside claims adjusting firm, was on the project site during the summer of 2000 investigating another claim for Allianz. (Pl.'s Ex. K; Pl.'s Ex. I.) Wentworth was later assigned to adjust the rain claim after Hunt provided notice pursuant to the contract.[4] (Def.'s Ex. 45.) Both sides also agree that Hunt never provided a proof of loss for the claims at issue in this suit although Hunt did provide a proof of loss for a related claim that Allianz has already paid off.

---

[4] Hunt argues that it gave notice earlier; however, it presents no evidence for a trier of fact to find in its favor on this point. Hunt argues that Allianz adjusters were on site late 2000 on other claims and that "given the catastrophic nature of the damage, there is no conceivable way Allianz was not aware of the damage." (Pl.'s Br. 25.) It provides no evidence of Allianz's actual notice before March 16, 2001. There is no argument about whether Hunt complied with the contractual requirements for notice before March 16, 2001—it did not. Therefore, it will be assumed for the purposes of this motion that the earliest that notice was given was March 16.

The months following Hunt's notice began the back and forth between Allianz and Hunt. Allianz claims that Hunt has been habitually late in complying or totally non-compliant with requests for documentation on its claim. On April 16, 2001, Allianz sent Hunt a reservation of rights letter based on the late notice of the rain event. (Def.'s Ex. 51.) Wentworth tried to get Hunt to provide it with documentation of its loss starting April 30, but did not receive anything until June 6. (Def.'s Exs. 52-55.) What Allianz did receive pertained to de-mucking damages. (Def.'s Ex. 55.) On July 11, Wentworth requested additional information from Hunt to help assess the claim. (Def.'s Ex. 56.) Wentworth sent three more letters to Hunt to follow up on this request. (Def.'s Exs. 57-59.) Some of the documents were provided September 7. (Def.'s Ex. 60.)

Hunt Executive Vice President, Robert Decker, and Project Manager, William Holwig sent Wentworth a letter on January 15, 2002, that assured Wentworth that all costs for repair of damages had been submitted. (Def.'s Ex. 23.) The final total according to Hunt was $1,350,372. (*Id.*) In February, Hunt submitted documentation for a claim for temporary heating costs. A partial proof of loss was submitted to Allianz on March 14, 2002. (Def.'s Ex. 46; Pl.'s Ex. X.) On March 28, 2002, Allianz issued a check to Hunt for $1,144,117 for "partial payment indemnity". (Def.'s Ex. 46.) Allianz's counsel wrote to Hunt on May 31, 2002, to "request[] that it receive all outstanding claim information from Hunt within the next 30 days." (Def.'s Ex. 63.)

Hunt's counsel wrote back on June 17, 2002, to state that it intended to pursue additional claims. (Def.'s Ex. 64.) He specifically mentioned that now that the project was substantially completed, they could provide information about probable liquidated

damages. (*Id.*) Counsel "recognized that we owe you additional documentation." (*Id.*) Allianz again requested the claim documentation on August 13, 2002 (Def.'s Ex. 65), and three days later, Hunt acknowledged it had not yet provided it. (Def.'s Ex. 66).

Despite Hunt's efforts to bring the project back up to schedule, it was unable to make up all the ground. On April 25, 2003, Hunt and Northwest entered into Change of Contract 70. This was a final settlement of all claims between Hunt and Northwest. The order listed the date of substantial completion as February 23, 2002. It asserted that Hunt believed "it is entitled to an extension of 116 days in the Contract Completion Date," but that Northwest would only give it 8 days. (Def.'s Ex. 26, p. 3.) Therefore, Northwest claimed it could impose 108 days of liquidated damages but that Hunt's acceptance of $3.5 million less than it felt it was owed satisfied Northwest's claim. (*Id.*)

In the meantime, Allianz had not received any documentation from Hunt since November 2002, so on December 1, 2003, Allianz sent Hunt a formal denial of any further claims. (Def.'s Ex. 17.)

## II.    DISCUSSION

This comes before the court on Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the court considers those facts that are

undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The parties disagree about what limitation period applies to this dispute.[5]  The Policy itself contains no limitation on when a suit can be brought.  Allianz argues because the insurance contract covers, among other things, against loss from fire, that Michigan Compiled Laws § 500.2833 mandates a one-year limitations period.[6]  Hunt argues that the general six-year breach of contract limitations period should apply.  *See* Mich. Comp. Laws § 600.5807(8); *Monti v. League Life Ins. Co.*, 391 N.W.2d 490, 493 (Mich. Ct. App. 1986) (applying six year statute to insurance contract).  The parties do

---

[5] In its motion, Allianz actually provides three possible defenses to the entire suit that it says require summary judgment in its favor.  The first is that Hunt is prohibited from suit because the statute of limitations has expired.  The second is that Hunt failed to provide timely notice of its claims in violations of the Policy.  The third is that Hunt failed to provide a proof of loss as required in the Policy.  Allianz also asserts that certain deficiencies in Hunt's claims should result in at least partial summary judgment in Allianz's favor.  The first is that the Policy specifically excludes consequential damages, which—Allianz claims—is exactly what the temporary heating and expediting costs are.  The second is that Allianz claims that Hunt was never actually assessed liquidated damages or at least did not comply with the Policy's provisions regarding liquidated damages.  Finally, Allianz claims that a separate deductible should be applied to each rain event as opposed to just one deductible for all the summer rains.  The court only addresses the statute of limitations issue.

[6] The parties do not dispute that under Indiana's choice of law approach, Michigan law governs the contract.  Indiana uses the Restatement approach.  *Am. Employers Ins. Co. v. Coachmen Indus., Inc.*, 838 N.E.2d 1172, 1174 (Ind. Ct. App. 2005).  The property insured was in Michigan and "the location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law."  *Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind. Ct. App. 1997) (citing Restatement (Second) of Conflict of Laws § 193 cmt. b).  In the facts of this case, no other contact to another state outweighs this.

not dispute that if a one-year limitation applies, the suit should be dismissed, but that it would not be barred by a six-year limitation.[7]

Chapter 28 of the Insurance Code of 1956 is titled Fire Insurance Contracts. Section 2833 provides "each fire insurance policy issued or delivered in this state shall contain the following provisions." Mich. Comp. Laws § 500.2833. Among these terms is a one-year statute of limitations for bringing suit, including a tolling period. This states:

> That an action under the policy may be commenced only after compliance with the policy requirements. An action must be commenced within 1 year after the loss or within the time period specified in the policy, whichever is longer. The time for commencing an action is tolled from the time the insured notifies the insurer of the loss until the insurer formally denies liability.

Mich. Comp. Laws § 500.2833(1)(q).

Allianz contends that this statute requires a one-year statute of limitations be read into its contract with Hunt. This limitations period was not expressly written into the contract; however, if the statute applies it would be as if the provision was actually

---

[7] The statute requires that the limitations period begin at the moment of loss and be tolled from the date that notice is given until a formal denial from the insurer. This means at best, the limitations period began to run on September 11, 2000 and was tolled from March 16, 2001 until December 1, 2003. Suit was brought October 20, 2004, meaning that well over twelve months had elapsed even with the tolling.

In their briefs, neither party argues that any claim should be treated differently from any other claim for purposes of the statute of limitations. While some states will apply a different statute of limitations to a non-fire claim where another statutorily specified limitation will apply, *see, e.g.*, *Wagnon v. State Farm Fire & Cas. Co.,* 951 P.2d 641 (Okla. 1997), Michigan is not one of them, *see Aldalali v. Underwriters at Lloyd's, London*, 435 N.W.2d 498, 500 (Mich. Ct. App. 1989).

written in the contract.  *Wendel v. Swanberg*, 185 N.W.2d 348, 352-53 (Mich. 1971) ("Mandatory statutory provisions are read into insurance contracts though they be omitted by the parties."); *Randolph v. State Farm Fire & Cas. Co.*, 580 N.W.2d 903, 905 (Mich. Ct. App. 1998) (reading limitation period of Mich. Comp. Laws § 500.2833(1)(q) into insurance contract where limitation provision as written was void).

Hunt counters that the Fire Insurance chapter should not apply to this contract. According to Michigan law, "a statute must be interpreted within the limits of its title." *Knight v. Limbert*, 427 N.W.2d 637, 638 (Mich. Ct. App. 1988).  The Policy does not purport to be a fire insurance contract; it is written on an "inland marine" form as opposed to a "fire insurance form" and the loss Hunt claims to have suffered was from rain, not fire.  This is a builder's risk policy which covers not just against the specific peril of fire but against "all risks of physical loss or damages to Property Insured." (Def.'s Ex. 2. at AGR 0029.)

Chapter 28 contains no provision which defines the type of contracts to which it is applicable other than to say:  "A policy or contract of fire insurance shall not be made, issued, or delivered by an insurer or by an agent or representative of an insurer, on any property in this state, unless it conforms to the provisions of this chapter."  Mich. Comp. Laws § 500.2806.  The Michigan Compiled Laws provide some guidance to the categorization of insurance policies.  Section 610 defines "Property insurance" expansively under the code as:

> insurance on dwelling houses, stores, and all kinds of buildings, and upon household furniture, goods, wares and merchandise, and any other

> property, against loss or damage by fire, earthquake, lightning, wind and water; and also against bombardment and/or explosion, whether fire ensues or not, but not to include steam boiler or flywheel explosion; and by and with the consent of the commissioner, insurance against any other loss or damage to property or any interest therein not prohibited by the laws of this state nor exclusively delegated to any other class or kind of insurer, including loss or damage of any character, whether by reason of burglary and theft of personal property or otherwise, and whether situated at any given time at a place of residence, or in storage, transit, or upon the person of the insured or otherwise. Property insurance shall be deemed to include also marine insurance as defined in section 614, inland navigation and transportation insurance as defined in section 616, and automobile insurance (limited) as defined in section 620.

Mich. Comp. Laws § 500.610. The Policy in this case falls under this definition of Property Insurance as does a Fire Insurance policy under chapter 28. There is no other definition in the code that would distinguish the two types of policies.

Unfortunately, the court could find no guidance from the Michigan Supreme Court and no direct guidance from the Michigan appellate courts; however, an appellate court in Wisconsin has dealt with this precise issue. In *Villa Clement, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA.*, 353 N.W.2d 369 (Wis. Ct. App. 1984), the Wisconsin Court of Appeals upheld summary judgment against plaintiff based on the statute of limitations. The facts in that case are similar to those in this case. During construction, water damaged the property. Under Wisconsin law, "'[a]n action on a fire insurance policy must be commenced within 12 months after the inception of the loss." *Id.* at 370. The suit was brought more than one year after the damage occurred. The insurance in that case also closely resembled the basic coverage in this case. It covered "'all risks of direct loss of or damage to the property insured from any external cause, subject to the exclusions, limitations, terms and conditions of this policy.'" *Id.* at

371. Several passages seemed to indicate that the policy envisioned fire as one of the perils covered. *Id.*

Unlike the Policy in this case, the policy in *Villa* did contain an express limitation limiting the amount of time a suit can be commenced to "within twelve (12) months next after the happening becomes known to the insured, unless a longer period of time is provided by applicable statute." *Id.* at 370. But the court explicitly held that "policy language aside, this suit was governed by the one-year limitation period set forth [under Wisconsin law] for actions on policies of "fire insurance." *Id.*

The court looked to Wisconsin statutory and case law to determine whether the term "fire insurance" was broad enough to encompass this type of builder's risk policy in the case. It looked first to the definition of fire insurance in the statutes, which read "An insurance corporation may be formed for the following purposes: (1) Fire insurance.- against loss or damage to property, by fire, lightning, hail, tempest, explosion, and against any other loss or damage from any cause to property or in the use of, or income from property." *Id.* (quoting Wis. Stat. § 201.04 (1973)). The court found that this could easily include "property indemnity insurance for any peril whatsoever." *Id.*

The court also looked to the Wisconsin Supreme Court's decision in *Riteway Builder's, Inc. v. First National Insurance Company of America*, 126 N.W.2d 24 (Wis. 1964). This held that the one-year statute of limitations applied to the collapse of a basement wall. That court noted, in dicta, "that multi-peril policies were derived from,

and were expansions upon, standard fire policies." *Villa Clement*, 353 N.W.2d at 372 (discussing *Riteway Builder's*, 126 N.W.2d 24.)

Finally, the court looked to a Commissioner of Insurance's treatment of the term in the Wisconsin Administrative Code.  The Commissioner lumped together "[f]ire, inland marine and other property insurance" defining them as "insurance against loss or damage to real and personal property, while stationary or in transit, arising out of fire or any other peril but not including any insurance defined in any other paragraph of this rule." Wis. Admin. Code Ins. § 6.75.  Further the Commissioner believed that the 12 month requirement applied to "fire, inland marine and other property insurance."  *Id.* § 6.76(3)(p).

Examining Michigan law, it is clear that Michigan holds a similar view of fire insurance as a broad category covering all forms of property insurance.  The Michigan Compiled Laws envisions policies with a fire insurance contract under Chapter 28 as its base with additional coverage added.  Chapter 29 of the Insurance Code of 1956 is titled "Basic Property Insurance" and in its definitions section contains definitions for "Basic property insurance" and "Home insurance" which consist of a fire insurance contract with added endorsements.  Mich. Comp. Laws § 500.2901(a), (e).  When these extra endorsements are added, they, too, are subject to the provisions of Chapter 28, including the 12-month statute of limitations.  *Aldalali v. Underwriters at Lloyd's, London*, 435 N.W.2d 498, 500 (Mich. Ct. App. 1989).

In practice, Michigan property insurance contracts seem to view fire insurance as a generic term for a broader form of property insurance, applying the requirements of Chapter 28 to a broad category of perils.  See *Elsey v. Hastings Mut. Ins. Co.*, 411 N.W.2d 460 (Mich. Ct. App. 1987) (applying homeowner's policy that conformed to requirements of Chapter 28, including the twelve month limitation, to a home's collapse); *Bourke v. N. River Ins. Co.*, 324 N.W.2d 52 (Mich Ct. App. 1982) (applying basic property insurance that "contained the standard provisions required by [chapter 28]" including the twelve month limitation, to damage sustained when a truck collided into a building).[8]

With this guidance, the court is confident that the Michigan Supreme Court would find that the one-year limitation in Michigan Compiled Laws § 500.2833 is applicable to all claims under this Policy.  If the damage in this case were from fire, Chapter 28 would have applied because "[a] policy or contract of fire insurance shall not be made, issued, or delivered by an insurer or by an agent or representative of an insurer, on any property in this state, unless it conforms to the provisions of this chapter."  Mich. Comp. Laws § 500.2806.  Therefore, the one-year limitation provision would have to be read into the contract.  To do otherwise would create an exception to Michigan Compiled Laws § 500.2806 for which this court can find no evidence the legislature contemplated.

---

[8] In fact, this homeowner's policy was written on the fire insurance form required at the time, with some added endorsements.  See Mich. Comp. Laws § 500.2832 (repealed 1990). Prior to 1990, § 500.2832 set forth a standard fire insurance policy that every policy had to use. Michigan then adopted 1990 PA 305 repealing § 500.2832 and creating § 500.2833, which merely set forth required contents, not form.

But, as explained above, reading the one-year provision into the contract applies it to all other perils as well.

Hunt argues that this is not a fire insurance policy, but rather that it is an inland marine policy.[9]  But under Michigan law, the distinction between fire insurance and inland marine is not useful—both fall under the definition of property insurance under Michigan Compiled Laws § 500.610.  Just because the Policy was written on an inland marine form does not make it exempt from the requirements of Chapter 28.  Section 500.2806 does *not* say that a contract of fire insurance must conform to the provisions of Chapter 28 *unless it is written on a different form*.

Hunt also argues that reading the requirements of Chapter 28 into this contract will "create precedent effecting [sic] tens of thousands of existing insurance policies for commercial risks."  (Pl's. Br. 23.)[10]  However, a rule that builder's risk policies like that at

---

[9] A Second Circuit opinion summarizes how inland marine policies have evolved to builder's risk policies:

> [Plaintiff] argues that a builders risk policy cannot be inland marine insurance because inland marine policies can be written only for movable things such as railway cars and cargoes, not construction projects. In fact, inland marine insurance has evolved to cover virtually all kinds of things that move or are in transport. *See generally* Roderick McNamara, Robert A. Laurence & Glenn L. Wood, *Inland Marine Insurance* (1987). Builders risk covers a project in construction, before it becomes insurable as a building, while its materials and components are being moved on-site, assembled, and put in place. In that sense, a building site becomes a terminus for cargo, and can be insurable as inland marine, as many states and insurance commissioners allow.

*Village of Kiryas Joel Local Dev. Corp. v. Ins. Co. of N. Am.*, 996 F.2d 1390, 1392 (2d Cir. 1993).

[10] Obviously, this Entry creates no precedent.  Under the law of case doctrine, the ruling or rulings in this Entry will govern the case currently before this court.  *See, e.g.*, *Trs. of*
(continued...)

issue in this case are subject to the statute of limitations in Chapter 28 would not dramatically affect the ability for construction companies and insurers to contract on their own for a longer limitations period if they desire.  In fact, the provision in Chapter 28 specifically envisions it.  *See* Mich. Comp. Laws § 2833(1)(q).

### III.     CONCLUSION

For the reasons set forth above, the one-year statute of limitations required by Michigan Compiled Laws § 2833(1)(q) applies to the Policy in this case.  Therefore, this suit was not brought within the applicable statute of limitations and Allianz's motion for summary judgment on all counts is **GRANTED**.

ALL OF WHICH IS ENTERED this 27th day of November 2006.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

---

[10](...continued)
*Pension, Welfare & Vacation Fringe Benefit Funds of IBEW Local 701 v. Pyramid Elec.*, 223 F.3d 459, 468 n.4 (7th Cir. 2000).  However, a district court's decision has no precedential authority and, therefore, is not binding on other courts, on other judges in this district, or even on other cases before the same judge.  *See, e.g.*, *Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998) ("a district court's decision does not have predential authority"); *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 697 (7th Cir. 1998) ("district court opinions are of little or no authoritative value"); *United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569, 571 (7th Cir. 1987) ("A single district court decision . . . has little precedential effect.  It is not binding on the circuit, or even on other district judges in the same district.").

Magistrate Judge Tim A. Baker

Bryce H. Bennett Jr.
RILEY BENNETT & EGLOFF LLP
bbennett@rbelaw.com

Grover Burton Davis
MCCLURE MCCLURE DAVIS & HENN
gbdavis@mmdhlaw.com

David Titus Dekker
THELEN REID & PRIEST
ddekker@thelenreid.com

David E. Heiss
FISHER KANARIS P.C.
dheiss@fisherkanaris.com

Peter Emanuel Kanaris
FISHER KANARIS PC
pkanaris@fisherkanaris.com

Stephen David Palley
THELEN REID & PRIEST LLP
spalley@thelenreid.com

Jefferson D. Patten
FISHER KANARIS P.C.
jpatten@fisherkanaris.com

Jose M. Pienknagura
THE HUNT CORPORATION
jmpienknagura@thehuntcorp.com

Murray D. Sacks
THELEN REID & PRIEST LLP
msacks@thelenreid.com